**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **REALTIME DATA, LLC d/b/a/ IXO,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil No. 6:09-cv-326-LED-JDL** |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **MORGAN STANLEY, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

Before the Court is Defendants BNY ConvergEx Group, LLC ("ConvergEx Group") and

BNY ConvergEx Execution Solutions LLC's ("CES") Motion to Dismiss for Lack of Personal

Jurisdiction (Doc. No. 52) ("Motion"). Plaintiff Realtime Data, LLC ("Realtime") has filed a

Response (Doc. No. 71) and a Sur-Reply (Doc. No. 92) ("Surreply"). Defendants additionally filed

a Reply (Doc. No. 88) ("Reply") and a Response to the Realtime Sur-reply (Doc. No. 111)

("Response to Realtime Surrpely").  Having fully considered the parties' arguments and for the

reasons set forth herein, the Court **RECOMMENDS** that Defendants' Motion to Dismiss be

**DENIED**.

**BACKGROUND AND PARTIES' CONTENTIONS**

On July 22, 2009, Plaintiff filed the instant action against twenty-one defendants for allegedly

infringing four patents: U.S. Patent Nos. 6,624,761 ("the '761 patent"); 7,161,506 ("the '506

patent"); 7,400,274 ("the '274 patent"); and 7,417,568 ("the '568 patent") (Doc. No. 1)

("Complaint"). The '761 and '506 patents claim systems and methods for content dependent data

compression, COMPLAINT at 5, and the '274 and '568 patents claim systems and methods for data feed acceleration and encryption. *Id*. at 5–6. Realtime asserts that ConvergEx Group and CES work together to "service an extensive client base that exceeds 1000 customers worldwide." RESPONSE at 1. Realtime alleges that through their business functions, ConvergEx Group and CES direct the delivery of infringing  (FAST-encoded) market data to its customers throughout the United States, including Texas. RESPONSE at 1; SURREPLY at 1.

### Defendant ConvergEx Group

The parties dispute whether ConvergeEx Group is a "holding company." In arguing that ConvergEx Group's contact with the forum cannot provide this Court with personal jurisdiction, Defendants emphasize that ConvergEx Group is not a subsidiary of New York Mellon Corporation, but is a passive holding company that "does not have clients or make or sell products anywhere." MOTION at 2; REPLY at 1–2 (relying on REPLY, EXH. 8, SISLER DECL.).  In short, Defendants argue that the jurisdictional facts alleged in Realtime's Complaint are incorrect, and Defendants deny that ConvergEx Group has any connection, presence, or clients in Texas. MOTION at 2.

Realtime alleges that ConvergEx Group is not a "holding company" because it "actively seeks to develop its worldwide business" through operation of a website: www.bnyconvergex.com. RESPONSE at 5–10. Realtime posits that this website provides trade execution and market data delivery hardware and software tools to ConvergEx Group's large institutional clients world-wide, including in Texas. *Id*. at 5. Relying on statements posted on the website, Realtime maintains that ConvergEx Group is a subsidiary of ConvergeEx Holdings LLC, which is an affiliate of the Bank of New York Mellon Corporation. RESPONSE at 6 (citing RESPONSE, EXH. 1, SCHUMAKER DECL.). Realtime further asserts that ConvergEx Group is not a mere holding company because it shares a

management team with other Bank of New York Mellon affiliates that take an active role in

ConvergEx Group's "business development." *See id*. at 7–8. According to Realtime, this business

development includes:  providing global agency brokerage and investment technology solutions to

institutional clients; providing tools to aid in the delivery of client information; and transmitting

market data to its customers through a strategic alliance with Thomson Reuters. *See* Response at

6–8 (relying on Response, Exhs. 4 & 6, Schumaker Decl.).

### *Defendant CES*

The parties also dispute whether CES has sufficient presence in Texas to satisfy the Court's

exercise of jurisdiction. Defendants argue that "CES's sole contact to Texas is that it is registered

to do business and has an agent in Texas and passively accepts orders from a small percentage of its

clients who reside in areas of Texas outside the Eastern District of Texas." Motion at 4, 8–9.

Defendants characterize CES's business model as that of "an institutional agency brokerage,"[1] but

contend that CES's website is not highly interactive and does not allow clients to transact business

or to access their account for market data delivery and trade execution.  Motion at 4; Reply at 8.

In short, Defendants deny the infringement allegations in Realtime's Complaint and deny that CES

has any discernible presence in Texas. *Id*. at 8.

Realtime argues that CES's admissions regarding its business operations demonstrate that

CES has sufficient contacts in Texas to warrant both general and specific jurisdiction in the Eastern

District of Texas. Specifically, Realtime points to CES's registered agent for service of process in

---

[1] By its own admission, CES is a financial services company that assists clients (institutional investors such as pension funds or asset managers) in buying and selling securities. Motion at 4. For example, CES clients interested in buying a large number of securities would come to CES to execute the purchase of shares at a favorable price, and Defendants state that CES receives trade orders through phone, email, an Order Management System ("OMS"), an Execution Management System ("EMS"), or third party products owned or licensed by the client. *Id*.

3

Austin, Texas, and the revenue that CES derives by assisting clients in buying and selling securities in Texas. RESPONSE at 9 (stating that approximately 4% of CES's clients are located in Texas and 2.2% of its revenue is derived from Texas clients). Realtime additionally represents that CES services its Texas clients through a highly interactive website, operated by the BNY ConvergEx Group of companies, that allows users to access their CES accounts and operate web-based tools that Realtime has accused of infringement. RESPONSE at 9–10.

## LEGAL STANDARD

Since personal jurisdiction in a patent case is intimately related to patent law, Federal Circuit law governs the issue. *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003). Where, as here, a motion to dismiss is based solely on briefing without an evidentiary  hearing, the burden of establishing a prima facie showing of jurisdiction is on Plaintiff. *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003) (citations omitted). The Court must accept Plaintiff's uncontroverted allegations as true and resolve factual conflicts in Plaintiff's favor. *Id.* (citations omitted).

To establish personal jurisdiction, Plaintiff must show that, absent a controlling federal statute, jurisdiction is proper under Texas' long-arm statute and that the exercise comports with Due Process. *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1376 (Fed. Cir. 1998) (citations omitted); *see also* FED. R. CIV. PRO. 4(k)(1)(a). The long-arm statute in Texas is coextensive with due process requirements. *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 761–62 (Tex. 1977); *Acceleron, LLC v. Egenera, Inc.*, 634 F. Supp.2d 758, 769 (E.D. Tex. 2009) ("The Texas long-arm statute reaches 'as far as the federal constitutional requirements of due process will allow.'") (internal citations omitted). Thus, where the reach of the long arm statute is the same as

the limits of the due process clause, the analysis of the state limitation "collapses into" a single

inquiry. *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1279 (Fed. Cir. 2005)

(citing *Inamed Corp v. Kuzmak*, 249 F.3d 1356, 1359 (Fed. Cir. 2001)). To satisfy this inquiry, due

process requires an out-of-state defendant have minimum contacts with the forum such that

maintaining the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe*

*Co. v. Washington*, 326 U.S. 310, 316 (1945).

The minimum contacts requirement may be met by a plaintiff showing either "general" or

"specific" jurisdiction over a defendant. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466

U.S. 408, 414 (1984). "Specific jurisdiction 'arises out of' or 'relates to' the cause of action even if

those contacts are 'isolated and sporadic.' . . . General jurisdiction arises when a defendant maintains

'continuous and systematic' contacts with the forum state even when the cause of action has no

relation to those contacts." *LSI Indus. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir.

2000) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985), and *Helicopteros*,

466 U.S. at 414–16)).

The Federal Circuit has outlined a three-prong test for determining whether the exercise of

specific personal jurisdiction comports with due process.  Courts are directed to look at whether:

(1) the defendant purposefully directed its activities at residents of the forum state;  (2) the claim

arises out of or relates to the defendant's activities within the forum state; and (3) the assertion of

personal jurisdiction is reasonable and fair. *Inamed*, 249 F.3d at 1360 (citing *Akro Corp. v. Luker*,

45 F.3d 1541, 1545 (Fed. Cir. 1995)). A plaintiff bears the burden of proving that minimum contacts

exist through the first two factors, while a defendant bears the burden of proving that the exercise

of jurisdiction would be unreasonable, corresponding to the third factor.  *Elecs. for Imaging*, 340

F.3d at 1350; *Invitrogen Corp. v. Evident Tech., Inc.*, No. 6:08-cv-163, slip. op. (E.D. Tex. Oct. 29, 2008) (Doc. No. 43) (unpublished) (hereinafter "Invitrogen").

## ANALYSIS

### I.    Overview of the Relationship Between Defendants ConvergEx Group and CES

Central to Realtime and Defendants' dispute over personal jurisdiction are the parties' contrary arguments as to how ConvergEx Group and CES are related to each other, how they are related to Defendant Bank of New York Mellon Corporation ("BNY"), and their relationship with Defendant Thompson Reuters.[2] While Realtime contends that CES essentially operates as a business unit or division of ConvergEx Group, and that together both Defendants infringe the patents-in-suit as subsidiaries of BNY, Defendants argue that ConvergEx Group and CES operate as separate legal entities.[3] *See* MOTION at 2; RESPONSE at 9.

In light of the representations of the parties, the Court concludes that BNY indirectly owns a non-controlling interest in ConvergEx Group through its interest in another holding company.[4] MOTION at 3. It also appears that BNY has an indirect interest in CES because CES is controlled by two holding companies, one of which is ConvergEx Group. *Id.* at 3–4. The Court is also persuaded, to some extent, of interconnectedness between ConvergEx Group and CES. However, while there appears to be a parent/subsidiary relationship (or at least some level of corporate relationship)

---

[2] Realtime has accused Thompson Reuters of infringing the same patents-in-suit in a related case before this Court. *See Realtime Data, LLC d/b/a IXO v. Thomspon Reuters et al.*, No. 6:09cv333-LED-JDL.

[3] Specifically, Defendants represent that while BNY indirectly owns a non-controlling interest in ConvergEx Group through its interest in another holding company, ConvergEx Group is not a subsidiary of BNY. MOTION at 3. Defendants similarly represent that BNY has only an indirect interest in CES. *Id.* at 3–4.

[4] This particular holding company linking BNY and ConvergEx Group was not identified in Defendants' Motion to Dismiss.

between the two Defendants, the Court will not uniformly impute forum contacts from CES to ConvergEx Group and vice versa. A parent and subsidiary are normally separate entities for jurisdictional purposes.[5] *See Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-832, 2004 WL 2550586, at *4–*5 (W.D. Tex. Sept. 24, 2004) (applying *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925)).

The connectedness between the Defendants is demonstrated through ConvergEx Group's controlling interest in CES, as well as the shared management team that jointly controls business activities for both entities, including the global services offered on the website maintained by the "BNY ConvergEx Group of companies." RESPONSE at 6; SURREPLY at 1–2. In short, the Defendants' joint representations on the website are relevant to Realtime's allegations that ConvergEx Group and CES publicly offer trading tools, especially the Portfolio Viewer, that Plaintiff accuses of infringing the patents-in-suit.[6] Although each Defendants' minimum contacts with the forum will be assessed

---

[5] The exception to separate jurisdictional analyses is when the parent company totally controls the actions of the subsidiary so that the subsidiary is the mere alter ego of the parent. *Systems Div., Inc. v. Teknek Electronics, Ltd.*, 253 Fed. Appx. 31, 37 (Fed. Cir. 2007) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1069 n.17 (9th Cir. 2000)). In a thorough discussion of the "alter ego" theory, the district court in *Kinetic Concepts* analyzed the standard for imputing jurisdictional contacts from a parent to a subsidiary in a patent infringement action. *Kinetic Concepts*, 2004 WL 2550586, at *4. Under Fifth Circuit precedent, in order to find the type of relationship that would allow the court to impute the parent corporation's "doing business" to the subsidiary, a court would have to conclude that "the parent corporation exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction." *Id.* at *5 (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)); *see also Systems Div.*, 253 Fed. Appx. at 37 (discussing when the exercise of jurisdiction over an alter ego is compatible with due process) (citing *Minnesota Mining & Mfg. Co. v. Eco Chem Inc.*, 757 F.2d 1256, 1265 (Fed. Cir. 1985)). Absent "clear evidence" that one party controls the other, courts presume the institutional independence of related corporations. *Kinetic Concepts*, 2004 WL 2550586, at *5 (citing *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999)). The Court does not find evidence that ConvergEx Group has exerted such domination and control over CES in this case.

[6] Specifically, Realtime submits representations from the website stating that the Portfolio Viewer allows Defendants' clients to receive periodically updated financial information, including shares, value, net value, and symbols for securities. SURREPLY at 3, n. 2. It is undisputed that clients of CES are provided with access to the Portfolio Viewer. *See* REPLY at 5; SURREPLY at 1–2.

separately, the Court cannot ignore that the parent and the subsidiary appear to operate in concert when offering and delivering financial services. Therefore, the following analysis will necessarily reference the overlapping business activities shared by ConvergEx Group and CES.

## II.      Jurisdictional Inquiry

### A.      General Jurisdiction

Realtime argues that this Court has both general and specific jurisdiction as to ConvergEx Group and CES, but the legal standard for general jurisdiction is "quite high" and the forum does not have general jurisdiction over a defendant business entity unless the defendant's contacts are "continuous and systematic." *Helicopteros,* 466 U.S. at 416; *Campbell Pet Co. v. Miale*, 542 F.3d 879, 882 (Fed. Cir. 2008) (acknowledging that the degree of contact with the forum state must be "quite high" to establish general jurisdiction). It is uncontested that both ConvergEx Group and CES are Delaware corporations with principals places of business in New York, NY and CES admittedly maintains a small client base in Texas, but none of the contacts put forward by Realtime rise to the level of "continuous and systematic."

The "continuous and systematic" standard has been applied in a variety of circumstances where a defendant has had more pervasive contact with the forum than either of the Defendants in this action, and still courts have denied general jurisdiction. *See, e.g., Shute v. Carnival Cruise Lines*, 897 F.2d 377, 381 (9th Cir. 1990) (no general jurisdiction due to insufficient contacts when non-resident corporation conducted promotional seminars in forum state, advertised in forum state, worked with forum state travel agents, and sold between 1 and 2% of its cruises to forum state residents); *Synthes v. GMReis*, 563 F.3d 1285 (Fed. Cir. 2009) (affirming district court's finding that general jurisdiction did not exist where defendant's contact with the forum included trade shows,

purchases of parts and a machine, the sale of products to one customer, and consulting about product development). Even given the number of sales (approximately 4%) that may have been made by CES to Texas customers, this low volume will not suffice for the "substantial and continuous" commercial presence required by the Supreme Court. *Int'l Shoe*, 326 U.S. at 320 (finding general jurisdiction where activities were neither irregular nor casual, but were "systematic and continuous throughout the years" and resulted in a large volume of interstate business); *see also Campbell,* 542 F.3d at 884.

Alternatively, Realtime suggests that ConvergEx Group, in particular, is subject to general jurisdiction for its operation of a website which allows it to serve as the ultimate source of trading tools and brokerage services to a national client base through ConvergEx Group's public Internet presence. *See* SURREPLY at 2. Although the Court will discuss the role of Defendants' Internet presence in its specific jurisdiction analysis, for purposes of general jurisdiction the Court notes the Federal Circuit's suggestion that a website, in the absence of other contacts, cannot establish general jurisdiction in a particular state because it was not specifically directed to a particular set of customers, "but instead is available to all customers throughout the country who have access to the Internet." *Campbell*, 542 F.3d at 884 (quoting *Trintec Industries, Inc. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, 1281 (Fed. Cir. 2005) ("[T]he ability of [forum] residents to access the defendants' websites . . . does not by itself show any persistent course of conduct by the defendants in the [forum]." )). Accordingly, the website operated by the BNY ConvergEx Group of companies is insufficient to establish general jurisdiction as to either Defendant.

9

B.      **Specific Jurisdiction**

1.      **ConvergEx Group**

ConvergEx Group denies selling any products and maintains that it is a holding company whose "only business is to passively own the membership interests of other companies, including CES, and to provide financial, legal marketing, human resources, and research and development services for its subsidiaries." MOTION at 3 (relying on MOTION, EXH. A, SISLER DECL.). ConvergEx Group does not explicitly refute, however, Realtime's assertion that it maintains a website in conjunction with its parent, ConvergEx Holdings LLC, that allows CES clients, including those in Texas, to receive data accused of infringing the patents-in-suit. RESPONSE at 12. Realtime argues that this web presence confers personal jurisdiction because ConvergEx Group has engaged in commercial activities in the United States that have violated the importing, using, or offering to sell prohibitions of 35 U.S.C. § 271(a).

ConvergEx Group denies having any clients or making and selling any products, but does not address the fact that it holds itself out as part of the larger group of "BNY ConvergEx Group of companies" that operate a website that is accessed by customers, including those in Texas. *See* RESPONSE at 6 (quoting where the website reads: "BNY ConvergEx Group LLC is a leading provider of global agency brokerage and investment technology solutions to institutional clients worldwide."). ConvergEx Group seeks to separate itself from the rest of the entities affiliated with ConvergEx Holdings LLC on the website, but the Court finds these efforts to be disingenuous.[7] As Realtime

---

[7] Defendants attempt to artificially distance themselves from the larger group of ConvergEx subsidiaries, by arguing: "For example, the web page discussing the 'Portfolio Viewer' never mentions BNY ConvergEx Group, LLC and only generically states that 'ConvergEx' offers an 'interface.'" REPLY at 5. The Court concludes that by referring to "ConvergEx" on the website, residents of the forum would reasonably believe Defendant ConvergEx Group to be an entity offering the Portfolio Viewer and related trading tools to CES clients.

points out, ConvergEx Group holds itself out on the Internet, assumedly for marketing and business-related purposes, as a part of the larger BNY ConvergEx Group of companies. Therefore, in the absence of a clarification making it clear that Defendant ConvergEx Group is not offering services to potential clients, this statement constitutes an offer of potentially infringing services under 35 U.S.C. § 271(a). By maintaining a web presence in a manner in which there is no meaningful way for a prospective client to determine that ConvergEx Group is separate and apart from the larger BNY ConvergEx Group of companies, the Court finds that ConvergEx Group is in fact involved in offering services to clients, including those located in the state of Texas.

> i. **Guiding Case Law: Contacts with the Forum through a Website**

Realtime contends that ConvergEx Group is susceptible to jurisdiction because of the nature of the website through which it establishes its Internet presence with residents of the forum. In analyzing whether ConvergEx Group's commercial activities at www.bnyconvergex.com are a source of personal jurisdiction, the Court is guided by standards established by the Federal Circuit and the Fifth Circuit in examining the "nature and quality of commercial activity conduct[ed]" by the site. *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336–37 (5th Cir. 1999) (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp.2d 1119, 1125–26 (W.D. Pa. 1997) (hereinafter "Zippo")); *Marynard v. Philadelphia Cervical Collar Co., Inc.,* 18 Fed. Appx. 814, 816–17 (Fed. Cir. 2001) (citing the Fifth Circuit personal jurisdiction analysis in *Mink*). Notably, in *Zippo*, the district court put forth a sliding scale test which other circuits, including the Fifth Circuit, have adopted as a standard for minimum contacts via a website. *Mink*, 190 F.3d at 336 (adopting the *Zippo* test in the context of general personal jurisdiction); *Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir. 2002) (extending the *Zippo* test to the context of specific personal jurisdiction).

The *Zippo* test contemplates a spectrum of commercial activity consisting of three categories of websites. *Powerhouse Prod., Inc. v. Widgery*, 564 F. Supp.2d 672, 679 (E.D. Tex. 2008) (hereinafter "Powerhouse") (citing *Mink*, 190 F.3d at 336). The first category envisions "highly interactive" websites by which "a defendant clearly does business over the Internet by entering into contracts with residents of other states which 'involve the knowing and repeated transmission of files over the Internet.'" *Powerhouse,* 564 F. Supp.2d at 679 (quoting *Zippo*, 952 F. Supp. at 1124). This type of "highly interactive" website makes personal jurisdiction appropriate because the owner of the site engages in repeated online contact with forum residents, often through the use of "virtual stores." *Powerhouse,* 564 F. Supp.2d at 679; *Invitrogen*, No. 6:08-cv-163, slip op. at 5. At the other end of the spectrum are "passive websites" which courts describe as being "devoid of interactivity" and constituting nothing more than advertisements or the posting of information on the site. *Powerhouse,* 564 F. Supp.2d at 679 (citing *Mink*, 190 F.3d at 336). These sites do not give rise to personal jurisdiction and the Federal Circuit has affirmed this analysis. *Autobytel, Inc. v. Insweb Corp.*, No. 2:07-cv-524, 2009 WL 901482, at *2 (E.D. Tex. Mar. 31, 2009) ("[a] passive website is insufficient to establish purposeful availment for the purpose of due process.") (quoting *Marynard.,* 18 Fed. Appx. at 816–17). In the middle are websites that allow some exchange of information with the defendant's host computer. *Powerhouse,* 564 F. Supp.2d at 679. "In this arena, 'the exercise of jurisdiction is determined by the level of interactivity and commercial nature of the exchange of information that occurs on the Website.'" *Id*. (quoting *Zippo*, 952 F. Supp. at 1124).

Although some courts have suggested that the availability and use of highly interactive,

12

transaction-oriented websites may alone support long arm jurisdiction,[8] the Federal Circuit has not yet adopted the *Zippo* sliding scale test or otherwise defined the standard for minimum contacts via a website. *AdvanceMe, Inc. v. Rapidpay LLC*, 450 F. Supp.2d 669, 673 (E.D. Tex. 2006); *see also Trintec,* 395 F.3d at 1281. The Federal Circuit has suggested that specific jurisdiction may be appropriate, however, when defendants maintain an interactive website and perform additional acts to purposefully avail themselves of the forum state, such as advertising, conducting business transactions with residents of the forum state, and soliciting funds from residents in the forum state. *Autobytel*, 2009 WL 901482, at *3 (citing *Trintec*, 395 F.3d at 1281). In evaluating these websites, especially in a patent infringement context, courts examine the interactivity and nature of forum contacts on a case-by-case basis.[9] *See, e.g.*, *Advance Me,* 450 F. Supp.2d at 673 (emphasizing that this determination is a "fact intensive inquiry"); *Invitrogen*, No. 6:08-cv-163, slip op. at 8–9; *Autobytel*, 2009 WL 901482, at *3. Most recently, courts have conferred specific jurisdiction where there was: (1) a "highly-interactive, transaction-oriented website," *see, e.g.*, *Autobytel*, 2009 WL 901482, at *2–*3, or (2) a "mid-level interactive website" that intentionally solicited business from

---

[8] Some cases have conferred general jurisdiction where the availability and use of a highly-interactive, transaction-oriented website is available to potential customers for the purpose of doing business. *See, e.g., Gorman v. Ameritrade Holding Corp.*, 293 F.506, 510–13 (D.C. Cir. 2002) (discussing general personal jurisdiction based on financial brokerage website); *Mieczkowski v. Masco Corp.*, 997 F. Supp. 782, 786–87 (E.D. Tex. 1998) (finding general personal jurisdiction over a defendant that maintained a furniture website accessible to Texas residents and received 3.2% of its sales from Texas) (discussing *Zippo*, 952 F. Supp.2d at 1125–26).

[9] Courts have articulated that this fact-based, case-by-case inquiry is necessarily complicated by the shift in the commercial landscape that has occurred since the Supreme Court's discussion of minimum contacts in the 1980s. Following the *Zippo* decision, Judge Folsom correctly recognized in 1998 that the ubiquitous presence of the Internet had caused a shift in the commercial landscape that would also require courts to address jurisdictional considerations that were never considered at the time *Burger King* was decided in 1985. *Mieczkowski v. Masco Corp.*, 997 F. Supp. 782, 786–87 (E.D. Tex. 1998) (recognizing that business conducted over the Internet has obviated the need for physical presence in a state in order to maintain personal jurisdiction). In short, in the age of information super highways, personal jurisdiction has evolved and adapted to changes in technological advances. *Id.* (citing *Panavision Intern., L.P. v. Toeppen*, 938 F.Supp. 616 (C.D. Cal.1996)).

Texas residents. *See, e.g., Powerhouse*, 564 F. Supp.2d at 679; *Invitrogen*, No. 6:08-cv-163, slip op. at 8–9.

In *Invitrogen*, the Court concluded that even though no Eastern District of Texas resident had purchased an accused infringing product through the defendant's website, offers to sell the accused products in violation of 35 U.S.C. §271(a) would constitute intentional conduct directed at forum residents, and thus, confer personal jurisdiction. *Invitrogen*, No. 6:08-cv-163, slip op. at 6–9. Similarly, in *AdvanceMe*, the Court found specific jurisdiction through offers for sale of allegedly infringing services to potential customers in Texas. *Advance Me,* 450 F. Supp.2d at 673–74 (noting that the offer for allegedly infringing services qualified as sufficient contacts with the forum, but also noting that defendant had two customers in Texas).

### ii.    Application: ConvergEx Group's Contacts with the Forum

It is with these principles in mind that the Court analyzes ConvergEx Group's contacts with the forum through the website maintained by the "BNY ConvergEx Group of companies." Weighing all allegations in favor of Plaintiff, this website is the source of allegedly infringing trading tool(s) that can be accessed directly by clients in the forum.  Importantly, the site is interactive in that it offers Texas residents with brokerage services provided by Bank of New York affiliates, including ConvergEx Group. Applying the *Zippo* test to ConvergEx Group's online contacts, the Court finds that it is a mid-level website. Realtime alleges that ConvergEx Group extensively markets itself through the website, including offering its clients with a "Portfolio Viewer" software tool, which provides the following interactivity:

> [a]llows clients to access their account from anyplace in the world for market data delivery and trade execution, including the state of Texas. This viewer provides substantial client interactivity functionality. 'ConvergEx [also] offers its clients a

web-based, fully secure interface [that they can log into] and connects to Flextrader and Real Time Price Server (RTP) over the Internet, allowing you to view and monitor your portfolios by our Portfolio Trading Desk.'

RESPONSE at 6–7 (relying on RESPONSE, EXH. 4, SHUMAKER DECL.).

Having reviewed the trading tools offered at www.bnyconvergex.com, ConvergEx Group is interacting with Texas residents by intentionally directing offers for infringing services in violation of 35 U.S.C. § 271(a).[10] By holding itself out on the website as a part of the BNY affiliates providing access to the Portfolio Viewer and other trading tools, ConvergEx Group is offering to deliver infringing market data to clients in Texas. A review of the evidence submitted in support of this Motion, however, does not affirmatively demonstrate that ConvergEx Group is involved in actual transactions occurring after the offer.[11] Rather, it appears that ConvergEx Groups' subsidiary, CES, is the entity actively assisting clients in buying and selling securities with the aid of online trading tools. Accordingly, while the website has many interactive features,[12] the Court concludes that ConvergEx Group has not executed the sales required for a finding that its website is highly-interactive under the *Zippo* sliding scale test. Thus, the website permits mid-level interactivity

---

[10] The Court has previously analyzed the effect of contract law when interpreting § 271(a). *See Invitrogen*, No. 6:08-cv-163, slip op. at 7–8 (discussing the statute in light of black letter contract principles of offer and acceptance). In *Invitrogen*, the Court ultimately held that an online offer for products accused of patent infringement can be a *prima facie* basis for personal jurisdiction, and further noted that the absence of disclaimers would weigh in favor of finding an offer on a website. *Id*.

[11] The Court takes notice of ConvergEx Group's attempts to distinguish itself  from transactions carried out by CES. While the finding that ConvergEx Group is making an offer under § 271(a)— in concert with CES and other BNY ConvergEx affiliates— supports the logical inference that ConvergEx Group is also in the business of providing services to clients, the Court has not identified the necessary evidentiary support to draw such a conclusion. Therefore, while the website itself suggests that ConvergEx Group is involved in transactions carried out by CES, the Court will not go so far as to attribute sales violating §271(a) to ConvergEx Group.

[12] Since ConvergEx Group is involved in offering Texas residents accused trading tools that allow customers access to otherwise restricted materials, the BNY ConvergEx Group of Companies website is not "passive." *See Invitrogen*, No. 6:08-cv-163, slip op. at 6 (citing *Zippo*, 952 F. Supp. at 1124).

between ConvergEx Group and forum residents.

While an offer to buy infringing products through a mid-level website has previously been held sufficient to confer personal jurisdiction, *Invitrogen*, No. 6:08-cv-163, slip op. at 8–9; *Advance Me,* 450 F. Supp.2d at 673–74, there are additional contacts in this case that suggest ConvergEx Group is purposefully availing itself of the forum state. *See Trintec*, 395 F.3d at 1281 (recognizing in dicta that "additional acts" such as advertising, conducting business transactions with residents of the forum state, and soliciting funds from residents in the forum state are considered when evaluating a defendant's contacts with the forum). Here, ConvergEx Group has also engaged in a targeted alliance with Thompson Reuters that purposefully avails itself of the forum state because the alliance allows for the transmission of market data to Texas residents.[13] Just as the *Trintec* Court relied on evidence in the record to establish minimum contacts through two interrelated aspects of defendant's contacts with the District of Columbia, the instant set of facts present two interrelated activities that establish ConvergEx Group's contacts with Texas. First, Defendant holds itself out to Texas customers on the website as a offering trading tools accused of infringement, and second, ConvergEx Group has entered into a strategic alliance in an effort to increase business, including business done within the state of Texas.

This alliance with a third party signifies an "additional act," such as that found in *Autobytel* when the Court found that online advertising was undertaken in an effort to generate revenue from Texas residents. *See Autobytel*, 2009 WL 901482, at *3. The alliance between ConvergEx Group and

---

[13] In its Reply brief, Defendant ConvergEx Group concedes that it shares a preferred broker agreement with Thomson Reuters where they refer customers to each other. RESPONSE at 10; REPLY at 6–7. The alliance itself creates at least the inference that this agreement was entered into, in part, to enhance ConvergEx Group's business. It is undisputed that Thompson Reuters is doing business in Texas and this alliance presumably increases ConvergEx Group's presence in Texas.

Thompson Reuters signifies a deliberate attempt to improve the delivery of services offered on its website to customers, including those in the state of Texas. The Court concludes that such a decision was made in a targeted effort to generate revenue for ConvergEx Group in places where Thompson Reuters does business. Accordingly, this alliance, when combined with the interactivity of the website, further supports the exercise of specific personal jurisdiction.

Resolving all factual conflicts in favor of Realtime, ConvergEx Group has the requisite minimum contacts with Texas to support specific jurisdiction.

## 2.    CES

Defendant CES argues that it cannot be subject to personal jurisdiction in this Court because CES is without locations in Texas, has no employees based in Texas, does not maintain a bank account in Texas, and has not commercialized any of its allegedly infringing products in Texas. *See* MOTION at 4, 8. CES concedes, however, that "CES's only connections to Texas are that it is registered to do business and has an agent in Texas, and a small percentage (approximately 4%) of its financial services clients are located in Texas and none are located in the Eastern District of Texas."[14] *Id*. at 4–5. The minimum contacts required by due process need not include physical presence. *See ABATIX Corp. v. Capra*, No. 2:07-cv-541, 2008 WL 4427285, at *3 (E.D. Tex. Sept. 24, 2008). The Supreme Court instructs that "[j]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state." *Id*. (quoting *Burger King*, 471 U.S. at 476). All that is required is that a commercial actor purposefully direct its efforts towards residents of the

---

[14] Despite CES's contention that no clients are located in the Eastern District Texas, this argument is largely irrelevant in analyzing jurisdiction. Personal jurisdiction only requires that the necessary contacts are found with the forum state, here the entire State of Texas. *See Autobytel*, 2009 WL 901482, at *2, n. 2 (citing *Int'l Shoe*, 326 U.S. at 317 (defining jurisdictional "presence" by reference to a corporation's actions "within the state")).

17

forum state.

CES concedes that it has a registered agent in Texas for service of process and it has at least 40 clients that are located in Texas generating revenue for CES. It is uncontroverted that CES is paying taxes on this revenue in the  state of Texas. RESPONSE at 9 (relying on RESPONSE, EXH. 8, SHUMAKER DECL.). These activities fall squarely within the range of activities considered by the Federal Circuit in *Trintec* when the Court discussed what might constitute purposeful availment when undertaken in conjunction with a highly interactive website. *See Trintec*, 395 F.3d at 1281 (noting that conducting business transactions with residents of the forum state and soliciting funds from residents in the forum state supports a finding that a defendant has availed itself of the forum).

CES provides its clients with tools and services accused to infringe the Realtime patents through the interactive website maintained by the BNY ConvergEx Group of companies at www.bnyconvergex.com.[15] REPLY at 8 (acknowledging that the Portfolio Viewer allows clients to view the status of trades); RESPONSE TO REALTIME SURREPLY at 2 (confirming that CES makes the Portfolio Viewer available to existing clients). Thus, the Court finds that the presence of actual transactions with forum residents elevates CES's level of web-based interactivity to that of "highly interactive" under the *Zippo* sliding scale test. CES is both promoting its interests through a highly

---

[15] The cause of action arises out of or directly relates to the allegedly infringing activities. CES readily identifies itself as an "institutional agency brokerage" that provides its clients with financial services such as the buying or trading  of securities. MOTION at 4. Realtime is accusing CES of infringing its patents by providing its customers, including those in Texas, with trading tools (including web based trading tools) that deliver infringing market data. *See* SURREPLY at 1.

The Court further notes that at this time it is jurisdiction that is at issue, not liability for patent infringement. *Genetic Implant Sys., Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1458 (Fed. Cir. 1997). The "arise out of or related to" requirement is not as stringent as what a plaintiff must show to establish patent infringement liability. *See Synthes (U.S.A.) v. G.M. dos Reis Jr. Ind. Com. de Equip. MEDICO a/k/a Gmreis*, No. 07-CV-309, 2008 WL 789925, at *5 (S.D. Cal. May 21, 2008) (citing 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 at 269 (3d ed. 2004)).

interactive website and engaging in additional commercial activities that are purposefully directed at the state of Texas. Although CES is not selling a physical product, it is uncontroverted that CES is offering and providing its clients with tools and services that are accused to infringe under 35 U.S.C. § 271(a) and CES is deriving as much as 2.2% of its revenue based on services provided to Texas clients.

Again, resolving all factual conflicts in favor of Realtime, the Court finds that CES has the requisite contacts with the state of Texas to justify subjecting it to suit in this forum. *See Avocent Huntsville*, 552 F.3d at 1332 (finding that for purposes of specific jurisdiction, the inquiry is easily discerned from the nature and extent of the commercialization of the accused products or services by the defendant in the forum) (citing *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt*, 148 F.3d 1355, 1360 (Fed. Cir. 1998)).

C.    **Exercising Jurisdiction Over ConvergEx Group and CES does not Offend Traditional Notions of Fair Play and Substantial Justice**

The last inquiry is whether the assertion of personal jurisdiction is reasonable and fair. *Avocent*, 552 F.3d at 1332. Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable. *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001). The defendant must make a "compelling case." *Burger King*, 471 U.S. at 477. In determining whether the exercise of jurisdiction is fair and reasonable, the court must balance the following: (1) the burden on the nonresident defendant of having to defend itself in the forum; (2) the interests of the forum state in the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests

19

of the state in furthering fundamental social policies. *Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 429 (Fed. Cir. 1996) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)); *see generally Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 115 (1987).

Defendants have failed to meet this burden. Both Defendants could reasonably foresee that the alleged infringement would be practiced in Texas through the interaction of Texas clients of CES with the website maintained by the BNY ConvergEx Group of companies at www.bnyconvergex.com. Texas has substantial interests in adjudicating this dispute and discouraging injuries that occur in this state. *See Autobytel*, 2009 WL 901482, at *3; *GSK Tech., Inc. v. Schneider Elec., S.A.*, No. 6:06-cv-361, 2007 WL 788343, at *4 (E.D. Tex. Mar. 14, 2007). Furthermore, subjecting Defendants to suit in this district may be inconvenient, but it would not be unfair or unreasonable because "[i]t is well recognized that modern communication and transportation have made defending a lawsuit in a foreign tribunal less burdensome." *GSK Tech.*, 2007 WL 788343, at *4. The Court concludes that this is not the rare case wherein "plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Id*. (quoting *Beverly Hills Fan Corp. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994)); *see also Akro*, 45 F.3d at 1549.

## CONCLUSION

The Court **RECOMMENDS** that Defendants' Motion to Dismiss be **DENIED**. Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report. A party's failure to file

written objections to the findings, conclusions and recommendations contained in this Report within

fourteen (14) days after being served with a copy shall bar that party from *de novo* review by the

district judge of those findings, conclusions and recommendations and, except on grounds of plain

error, from appellate review of unobjected-to factual findings and legal conclusions accepted and

adopted by the district court.  *Douglass v. United States Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.

1996).


**So ORDERED and SIGNED this 28th day of April, 2010.**


JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE