IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| REALTIME DATA, LLC D/B/A IXO,<br><br>*Plaintiff*,<br><br>v.<br><br>MORGAN STANLEY, BANK OF AMERICA CORPORATION, THE BANK OF NEW YORK MELLON CORPORATION, CREDIT SUISSE HOLDINGS (USA), INC., THE GOLDMAN SACHS GROUP, INC., HSBC BANK USA, N.A., JPMORGAN CHASE & CO., and SWS GROUP, INC.,<br><br>*Defendants*. | Civil Action No.:  6:09-cv-00326-LED-JDL<br><br>PATENT CASE<br><br>DEMAND FOR JURY TRIAL |

**DEFENDANTS BNY CONVERGEX GROUP, LLC AND BNY CONVERGEX EXECUTION SOLUTIONS LLC'S OBJECTIONS TO THE REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE DATED APRIL 28, 2010**

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, Defendants BNY ConvergEx Group, LLC ("ConvergEx Group") and BNY ConvergEx Execution Solutions LLC ("CES") (collectively "the ConvergEx defendants") hereby submit the following objections to the Report and Recommendation of United States Magistrate Judge dated April 28, 2010 (D.I. 161) ("R&R"), which recommends that this Court deny the ConvergEx defendants' Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 52) in this suit brought by Plaintiff Realtime Data, LLC ("Realtime").

**PRELIMINARY STATEMENT**

The Due Process Clause's minimum contacts requirement guarantees "potential defendants" the right "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."  *World-Wide Volkswagen Corp.*

*v. Woodson*, 444 U.S. 286, 297 (1980).[1]  The R&R would eliminate that guarantee for companies that have websites or enter into agreements with other companies and therefore should not be adopted.

The R&R correctly found no general jurisdiction over either of the ConvergEx defendants.  Nevertheless, it recommended denial of the motion to dismiss on the basis of specific jurisdiction.  Under the Supreme Court and Federal Circuit's test for specific jurisdiction, the defendant must purposefully direct its activities within the forum state and the plaintiff's claim must arise out of or relate to those activities.  The claim in this case is that Realtime's patents have been infringed by the ConvergEx defendants' "data compression products and/or services."  It is uncontroverted, however, that neither ConvergEx Group nor CES has ever made, used, sold, or offered for sale any data compression products or services in Texas.  ConvergEx Group, a holding company, does not do data compression and sells no products.  To the extent CES does data compression, it would take place in CES's data processing centers in the New York City metropolitan area and would not involve Texas residents.

Despite these facts, the R&R concludes that both ConvergEx defendants are subject to suit in Texas.  The R&R reaches the wrong conclusion on several grounds.  First, the R&R's conclusion as to ConvergEx Group hinges on the erroneous determination that www.bnyconvergex.com, a website that the R&R found to be "maintained by the BNY ConvergEx Group of companies," is an "offer" for sale under 35 U.S.C. § 271(a).  The R&R never identifies *what* is being offered for sale and does not analyze whether that "offer" relates to Realtime's infringement claims.  Realtime never made this argument, so the ConvergEx

---

[1] Unless noted, all internal citations and quotations are omitted, and all emphasis is added.

defendants have not yet had an opportunity to address it, but it is clear from the website's face that it is not an "offer" to sell anything, much less any "data compression products and/or services."

The R&R reaches the wrong determination as a result of another legally unsupportable conclusion.  The R&R concludes that because ConvergEx Group entered into a customer-referral agreement with Thomson Reuters, a national company, this too supports specific jurisdiction over ConvergEx Group.  But the agreement with Thomson Reuters has nothing to do with Realtime's patent claims.  The agreement does not relate to data compression or any accused products; it merely provides for customer referrals.  The agreement also has no connection to Texas.  The R&R found that **Thomson Reuters** has contacts in Texas, but Thomson Reuters is a third party and as a matter of law its contacts cannot be imputed to ConvergEx Group.[2]

As to CES, it is respectfully submitted that the R&R continues to confuse general and specific jurisdiction by failing to take into account the requirement that the defendant's forum-related activities must relate to the plaintiff's claim.  The R&R again relies on the www.bnyconvergex.com website, and states that CES provides "tools and services" through that website.  But the only "tool or service" mentioned is the "Portfolio Viewer," which merely permits CES's clients to view their portfolios.  It does no data compression and Realtime has not accused the Portfolio Viewer of infringement.  The R&R further relies on the fact that CES has clients and a registered agent and pays taxes in Texas.  Those facts again are legally irrelevant for specific jurisdiction, which requires that *the claim itself* arise out of or relate to CES's

---

[2] Thomson Reuters is a defendant in the related action filed by Realtime alleging infringement of the same patents that are at issue in this case.  *See Realtime Data, LLC d/b/a IXO v. Thomson Reuters et al.*, No. 09-cv-333 (E.D. Tex.).  Any Texas contacts Thompson Reuters may have are pertinent to that action alone.

3

contacts with Texas. CES's Texas clients, taxes, registration and agent are not the basis for Realtime's infringement claims.

It is hard to overstate the sweeping scope of the R&R's reasoning. If the R&R is upheld, then every company that has any sort of commercial webpage—even those without "virtual stores"—and that enters into an agreement with another company is at risk of being haled into court wherever that *other company* does business, even if neither the agreement nor the business done by the other company has any relationship to the plaintiff's claims. Likewise, the R&R threatens to undermine the important distinction between general and specific jurisdiction by making the specific jurisdiction test turn on whether the defendant has a registered agent or pays taxes in a state, and not on whether the actual subject of the suit is forum-related. Neither of these results is consistent with the law. Accordingly, the ConvergEx defendants respectfully ask this Court to sustain their objections to the R&R and to dismiss Realtime's claims against them.

## FACTUAL BACKGROUND

Plaintiff Realtime accuses twenty-one defendants including the ConvergEx defendants of infringing patents that relate to "data compression products and/or services." (Am. Compl., D.I. 4, ¶¶ 34, 39, 44, 49.) ConvergEx Group is a Delaware LLC with offices in New York City and Boston. It has no clients, but instead merely passively holds the membership interests of other companies and provides routine administrative services to its subsidiaries. Thus, "ConvergEx Group does not make, use, sell, or offer for sale any products or services"—*anywhere*—and certainly "**does not operate, conduct, engage in, or carry out any business in Texas**." (Mot., D.I. 52, Ex. A at ¶ 5.) ConvergEx Group has entered into a customer-referral agreement— entitled a "Preferred Broker Arrangement"—with Thomson Reuters. (Reply, D.I. 88, Ex. 6.) In it, Thomson Reuters agrees to designate ConvergEx Group's "affiliated-broker dealers" as "preferred brokers," and those "affiliated-broker dealers" in turn agree to designate Thomson

4

Reuters as a "preferred market data vendor." (*Id.* at 1.) But nothing in the agreement "requires or permits [ConvergEx Group] or any of its subsidiaries to deliver market data. [ConvergEx Group] does not deliver market data to any state—including Texas." (Reply, D.I. 88, Ex. 7 at ¶ 4.)

CES is a type of financial services company known as an institutional agency brokerage. Like ConvergEx Group, CES is a Delaware LLC with its principal place of business in New York City and with no locations in Texas. CES assists institutional investors such as pension funds in buying and selling securities. CES's clients decide whether to conduct these trades by "phone, email, through an Order Management System or an Execution Management System (called an OMS or EMS), or through third party products owned or licensed by such client." (Mot., D.I. 52, Ex. A at ¶ 8.) CES does not supply phone or email systems, and most EMS orders come from third-party systems that connect to many brokers in addition to CES. Only one client in Texas has an EMS system provided by CES, but that client has not used the EMS to place any orders this year or last. In any event, it is uncontested that "*The CES EMS system used by that client does not do data compression.*" (*Id.*) In fact, "**CES has not commercialized any data compression product or service in Texas**," and "[t]o the extent CES does data compression or other data processing, *it would take place in CES's data processing centers in the New York City metropolitan area* and would not involve Texas Residents." (*Id.* at ¶ 10.)

CES also "exclusively" makes available a "Portfolio Viewer feature … to its clients." (Reply, D.I. 88, Ex. 7 at ¶ 5.) Realtime does not identify the Portfolio Viewer as an infringing product in either its Complaint or its Rule 3-1 infringement contentions and has not supplemented those infringement contentions to include the Portfolio Viewer despite all of the briefing on the ConvergEx defendants' Motion to Dismiss. "The Portfolio Viewer feature

5

merely allows existing clients to view the status of certain trades." (*Id.*) It "cannot be used to initiate trade execution or to place trade orders." (*Id.*) Indeed, neither the ConvergEx website nor the Portfolio Viewer can "be used to buy any products," and neither is "directed at Texas residents any more than the general population." (*Id.*)

As the R&R correctly found, the ConvergEx defendants have separate legal personalities and follow all corporate formalities necessary to maintain that separateness. *See* R&R at 6-8.

## ARGUMENT

### A.   The R&R Errs as to ConvergEx Group

The R&R found specific personal jurisdiction exists over ConvergEx Group based on its conclusions that the www.bnyconvergex.com website is both a "mid-level" interactive website under *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), and an "offer for sale" under 35 U.S.C. § 271(a), and because ConvergEx Group entered into a customer-referral agreement with Thomson Reuters. R&R at 16-17. Neither the R&R's conclusions about the website nor the Thomson Reuters agreement can ground personal jurisdiction in this Court.

First, the Federal Circuit has never adopted the "*Zippo* … sliding scale test." *Id.* at 13. Nor has *Zippo* received universal approval. *See, e.g.*, *Shamsuddin v. Vitamin Research Prods.*, 346 F. Supp. 2d 804, 810-813 (D. Md. 2004) (listing authorities that "explicitly or implicitly have criticized *Zippo*'s emphasis on website interactivity" and concluding that "interactivity is important only insofar as it reflects commercial activity, and then only insofar as that commercial activity *demonstrates purposeful targeting of residents of the forum state*"); *Eagle Coffee Co., Inc. v. Eagle Coffee Int'l, Inc.*, No. L-09-2585, 2010 WL 481201, at *2-4 (D. Md., Feb. 4, 2010) (following *Shamsuddin*'s analysis of *Zippo* to reject personal jurisdiction when "nothing on [the] website suggests that [the defendant] intended to target the residents of Maryland (or any state) more than residents of any other state").

6

But even if the Federal Circuit were to adopt *Zippo* in some form, *e.g.*, *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714-15 (4th Cir. 2002) ("adopting" but "adapting" *Zippo* to require that a defendant "*direct* its electronic activity *specifically* at a[] target in [the state]"), www.bnyconvergex.com is not even a "mid-level" site because it only allows clients of companies like CES to *monitor* trades which already have been made, but not *make* trades directly. The site, therefore, is merely "***passive" because "consumers cannot use it to make purchases.***" *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000); *see also McGill Tech. Ltd. v. Gourmet Techs., Inc.*, 300 F. Supp. 2d 501, 507 (E.D. Mich. 2004) (finding that a website is "passive" because "it does not allow a visitor to the site to purchase products or otherwise directly transact business over the site"). Indeed, a website is "passive" even if it allows "members who have been issued a 'Member ID' and password to access their 'electronic medical record patient portal,'" so long as it does not allow "form[s] to be submitted online" or "purchases" to be made "online." *Healix Infusion Therapy, Inc. v. Helix Health, LLC*, No. H-08-0337, 2008 WL 1883546, *11 (S.D. Tex., April 25, 2008) (Lake, J.). The www.bnyconvergex.com website allows neither.

The R&R is further in error by concluding that www.bnyconvergex.com is "an offer of potentially infringing services under 35 U.S.C. § 271(a)." R&R at 11, 15 n.10. The R&R gives no explanation why the website is an offer for sale under 35 U.S.C. § 271(a) and Realtime never alleged that the website was an offer for sale. Federal Circuit precedent makes clear that the www.bnyconvergex.com website is not an "offer" as a matter of law.

The Federal Circuit has expressly "define[d] § 271(a)'s 'offer to sell' liability according to the norms of traditional contractual analysis." *Rotec Indus. Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254-55 (Fed. Cir. 2000). Under those traditional norms, "An offer is the manifestation of

7

willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001). Hence, this Court has found a website must "*include specific terms and sufficient definiteness*, as required by common-law principles of contract law, to rise to the level an offer to sell." *QR Spex, Inc. v. Motorola, Inc.*, 507 F. Supp. 2d 650, 660 (E.D. Tex. 2007). If "the terms on [a] website … lack[] key details such as delivery terms," then the site *cannot* satisfy minimum contacts because it is "a mere invitation for an offer from another." *Id.* A communication also "**cannot be construed as an 'offer'" in the absence of definite "price terms**." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005); *see also Xactware, Inc. v. Symbility Solution Inc.*, 402 F. Supp. 2d 1359, 1368 (D. Utah 2005); *Moldflow Corp. v. Simcon, Inc.*, 296 F. Supp. 2d 34, 43-44 (D. Mass. 2003).

The R&R does not reference or analyze the Federal Circuit's test for an offer for sale under § 271(a). Under the test, the www.bnyconvergex.com website cannot be construed as an offer for sale. The website has no pricing or delivery information and presents no contract terms. The R&R does not identify a specific product or service that is the subject of any alleged "offer" on the website. Instead, the website merely generically describes products and services of the respective member companies. The www.bnyconvergex.com website thus is much further removed from an offer than the website this Court found insufficient in *QR Spex*. In *QR Spex*, the website permitted customers to place pre-orders for the product that was accused of infringement. *See* 507 F. Supp. 2d at 560. This Court held that was insufficient to constitute an offer for sale under § 271(a), however, because the site did not specify delivery terms, and therefore could not support specific jurisdiction. *Id.* (granting motion to dismiss). So too here.

Because there are no specific terms, as a matter of law www.bnyconvergex.com is not an offer for sale and consequently personal jurisdiction does not lie in Texas.

The R&R is erroneous in another respect. The R&R concludes that "there are additional contacts in this case that suggest ConvergEx Group is purposefully availing itself of the forum state." (R&R at 16.) By "additional *contacts*," however, the R&R has reference to just one contact: ConvergEx Group's customer-referral agreement with Thomson Reuters. The R&R then springs to the conclusion that this agreement is a meaningful contact between ConvergEx Group and Texas based only on inferences and presumptions that are not supported in the record or by applicable precedent:

> The alliance itself creates at least the ***inference*** that this agreement was entered into, in part, to enhance ConvergEx Group's business. It is undisputed that Thompson Reuters is doing business in Texas and this alliance ***presumedly*** increases ConvergEx Group's presence in Texas.

R&R at 16, n.13. This is erroneous. First, there is no evidence that the customer-referral agreement has affected any business in Texas for ConvergEx Group or anyone else. It is uncontroverted that the agreement says nothing about Texas and includes no provisions directed toward Texas. (Reply, D.I. 88, Ex. 6; *id.* Ex. 7 at ¶ 4.)

Second, the R&R imputes ***Thomson Reuter's*** Texas contacts to ConvergEx Group. The R&R cites no case where the contacts of an independent third-party have been imputed to a defendant, and there is ample authority that such contacts cannot be imputed. *E.g.*, *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (Fed. Cir. 1998) ("In simple terms, doing business with a company that does business in Minnesota is not the same as doing business in Minnesota."); *Dynetech Corp. v. Leonard Fitness, Inc.*, 523 F. Supp. 2d 1344, 1347 (M.D. Fla. 2007) (including links to forum merchants "is too narrow a thread on which to find a meaningful 'contact' for the purposes of due process"). The only case the R&R does cite

9

involved online "targeted advertising" in Texas by the defendant itself. R&R at 16 (citing *Autobytel, Inc. v. Insweb Corp.*, No. 2:07-cv-524, 2009 WL 901482, *3 (E.D. Tex. Mar. 31, 2009)). But there is a world of difference between that case, in which the defendant chose to advertise in Texas, and this case where ConvergEx Group simply entered into an agreement with a national company that—independent of the agreement—happens to do some business in Texas. Indeed, "personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 346 (5th Cir. 2004). The R&R, however, would turn the doctrine of corporate separateness on its head. While a subsidiary's contacts *cannot* be imputed to its parent, *e.g.*, *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159-61 (5th Cir. 1983), the R&R concludes that an independent third-party's contacts somehow *can* be imputed to that same parent—even though an independent third-party is even further removed from a parent than is a subsidiary. Defendants respectfully urge the Court not to make such a leap.[3]

Third, there is no evidence connecting the Thomson Reuters agreement and Realtime's infringement claims. In fact, the customer-referral agreement says nothing about data compression products and services or any of the products accused of infringement.[4] The R&R

---

[3] Likewise, though the ConvergEx defendants are not alter-egos of each other, R&R at 7-9, the R&R suggests that contacts can be imputed between the two, *id.* at 9 ("[T]he Court cannot ignore that the parent and the subsidiary appear to operate in concert when offering and delivering financial services."). This also is error. *E.g.*, *Hargrave*, 710 F.2d at 1160 (not imputing contacts even when one corporation "had complete authority over general policy decisions" of another).

[4] The R&R asserts that "the alliance allows for the transmission of market data to Texas residents." (R&R at 16.) But there is no support for that assertion; the agreement says nothing about transmission or provision of market data. In making this assertion, the R&R relies exclusively on "inference" and "presum[ption]." (*Id.* & n.13.) In any event, Realtime's

(Continued…)

relies on dicta from *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275 (Fed. Cir. 2005), to suggest that if there is both a "mid-level [interactive] website" and some "'additional acts' such as advertising, conducting business transactions with residents of the forum state, and soliciting funds from residents in the forum state," then that can ground specific jurisdiction even if the "additional act" is unrelated to the cause of action. (R&R at 16-17.) The R&R concludes that the agreement with Thomson Reuters is such an "additional act."

However, it is respectfully submitted that this misinterprets *Trintec*. The Federal Circuit did not change the well-established rule that, for specific jurisdiction, the defendant's forum-related contacts must arise from or relate to the plaintiff's claims. *E.g.*, *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009) (specific jurisdiction "must be based on activities that arise out of or relate to ***the cause of action***"). Instead, *Trinitec* was merely interpreting "the District of Columbia long-arm statute," which, unlike the Texas long-arm statute, is not co-extensive with the Due Process Clause. *Trintec*, 395 F.3d at 1282. The Federal Circuit stated that if on remand the district court were to conclude that the defendant's contacts satisfied the D.C. long-arm statute, the district court "will *then* have to address whether such jurisdiction would be consistent with due process …." *Id.* at 1283. Thus, allusions to "advertising, conducting business transactions with residents of the forum state, and soliciting funds from residents in the forum state," R&R at 16, are explained by the fact that *those relate to the requirements of the D.C. long-arm statute*, as the Federal Circuit meticulously set out in the beginning of its analysis. *See Trintec*, 395 F.3d at 1280-81 (listing the requirements of D.C.

---

complaint does not claim that the mere transmission of market data infringes its patents. Rather, its claims relate to "data compression products and/or services." (Am. Compl., D.I. 4, ¶¶ 34, 39, 44, 49).

Code § 13-423(a) (2004)); *see also id.* at 1282 ("In short, on the record before us we are unable to determine whether, *under the District of Columbia long-arm statute*, Pedre is transacting business in the District of Columbia. Nor can we ascertain whether Pedre is causing others injury in the District by its conduct outside the District while regularly doing or soliciting business, engaging in any persistent course of conduct, or deriving substantial revenue from goods used or consumed in the District."). The R&R's reliance on the Thompson Reuters customer-referral agreement without finding any connection between the agreement and Realtime's infringement claims is thus legally erroneous.[5]

Because www.bnyconvergex.com is not an "offer," and because the customer-referral agreement with Thomson Reuters is not a Texas contact for purposes of specific jurisdiction, this Court should find that personal jurisdiction is absent and dismiss ConvergEx Group from this suit.

### B.      The R&R Errs as to CES

The R&R found specific personal jurisdiction exists over CES because (1) CES generates revenue from clients in Texas, pays taxes on those revenues, and has a registered agent in Texas, and (2) the www.bnyconvergex.com website is "highly interactive" as it relates to CES. R&R at 18-19. Again, the R&R errs.

---

[5] Indeed, to the extent, *if any*, that *Trintec* has a constitutional core, it is that there can be no personal jurisdiction without actual sales to the forum. In *Trintec* there was an interactive website, *see* 395 F.3d at 1278, but the court remanded to see "whether any District residents have ever actually used Pedre's website to transact business," *id.* at 1281. The R&R also misinterprets this Court's decision in *AdvanceMe, Inc. v. Rapidpay LLC*, 450 F. Supp. 2d 669 (E.D. Tex. 2006). *AdvanceMe* does not hold that an offer *by itself* is a sufficient "contact" under the Due Process Clause, even without any Texas sales. Instead, this Court assessed *all* the contacts to reach its decision that "through its website *and* previous provision of [infringing] services in Texas, Rapidpay has the requisite minimum contacts …." *Id.* at 673-74.

12

At the outset, two points bear emphasizing. First, the R&R expressly found that CES is not subject to general jurisdiction in Texas. *See* R&R at 8-9. But second, the R&R concluded that because CES has a "registered agent in Texas" and "at least 40 clients" in the State which accounts for "as much as 2.2% of its revenue," and because CES pays "taxes on this revenue in the state of Texas," CES is subject to specific jurisdiction in Texas. R&R at 18-19. However, specific jurisdiction "must be based on activities that arise out of or relate to the cause of action." *Autogenomics*, 566 F.3d at 1017. Thus, the fact that CES has a registered agent or business or pays taxes in Texas is irrelevant to specific jurisdiction in Texas unless those activities are related to Realtime's claims for patent infringement. They are not. CES's payment of taxes, and its registered agent, clients, or revenues are in no way related to Realtime's patent infringement claims. Realtime itself never suggested or pointed to such contacts as support for *specific* jurisdiction in any of its briefs on the Motion to Dismiss.

The R&R bases its determination on its misunderstanding of the Federal Circuit's decision in *Trintec*. The R&R states that CES's revenues, clients, and tax payments

> fall squarely within the range of activities considered by the Federal Circuit in *Trinitec* when the Court discussed what might constitute purposeful availment when undertaken in conjunction with a highly interactive website. *See Trinitec*, 295 F.3d at 1281 (noting that conducting business transactions with residents of the forum state and soliciting funds from residents in the forum state supports a finding that a defendant has availed itself of the forum).

R&R at 18.

As noted above, however, *Trintec* alluded to the defendant's business transactions and solicitation of funds to answer a question about D.C. statutory law—not to analyze specific jurisdiction under the Due Process Clause. This failure to make this distinction places the R&R's analysis in conflict with the Supreme Court and the Federal Circuit's mandate that activities supporting specific jurisdiction must themselves relate or give rise to the plaintiff's

13

claim.  *E.g.*, *Autogenomics*, 566 F.3d at 1018-19 (explaining that under the Supreme Court's "*International Shoe* analysis," specific jurisdiction is limited to cases where "(1) the defendant purposefully directed its activities at residents of the forum, (2) ***the claim arises out of or relates to those activities***, and (3) assertion of personal jurisdiction is reasonable and fair") (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The R&R also errs in its conclusion that specific jurisdiction is proper because the www.bnyconvergex.com website is "highly interactive" as it relates to CES.  According to the R&R, "CES's level of web-based interactivity…[is] 'highly interactive' under the *Zippo* sliding scale test" because "CES provides its clients with tools and services accused of infringing the Realtime patents through the [www.bnyconvergex.com] website."  (R&R at 18. )

But as explained above, the Federal Circuit has never adopted the *Zippo* test.  Likewise, courts have held that if a website cannot be used for purchasing or ordering goods or services, then it is merely a "passive" site.  *See Bancroft*, 223 F.3d at 1086; *McGill Tech.*, 300 F. Supp. 2d at 507; *Healix Infusion*, 2008 WL 1883546, at *11.  In any event, all the www.bnyconvergex.com site does is allow CES clients (or clients of other member companies) to monitor trades or transactions that they have already made by phone, email, or some other medium *that is not the website*.  (Mot., D.I. 52, Ex. A at ¶ 8.)  The R&R never explains how a website's "web-based interactivity" on the *Zippo* sliding scale test can change because of communications that do not occur on the website.

The R&R further errs in its underlying conclusion that CES provides clients with "tools and services" accused of infringing the Realtime patents through the www.bnyconvergex.com site.  The only tool or service identified is the "Portfolio Viewer" feature which displays the status of securities trades for clients.  But in order for this feature to be relevant to specific

14

jurisdiction, it itself must relate to Realtime's patent claims. *See Revell v. Lidov*, 317 F.3d 467, 472 (5th Cir. 2002) ("For specific jurisdiction, we look *only* to the contact out of which the cause of action arises—in this case the maintenance of the internet bulletin board. Since the [suit] does not arise out of [other aspects of the site], *those portions of the website need not be considered*."). Here, Realtime's patent claims do not arise out of the viewing of securities trade information. Rather, Realtime accuses the ConvergEx defendants of patent infringement through "***data compression*** products and/or services." No one alleges that the www.bnyconvergex.com website can be used to compress data or that the viewing feature is one of the data compression products or services accused of infringement. In fact Realtime does not accuse any part of the Portfolio Viewer of any infringement in its infringement contentions. *See* May 12, 2010 Declaration of Carl J. Blickle, Ex. 1, Pl. Rule 3-1 Disclosures at 10-11.

As the ConvergEx defendants have explained, "To the extent CES does data compression or other data processing, *it would take place in CES's data processing centers in the New York City metropolitan area* and would not involve Texas Residents." (Mot., D.I. 52, Ex. A at ¶ 10). Put simply, there is no evidence that the "tools and services" provided in the CES portal in any way do "data compression," *id.*, and so those "tools and services" cannot infringe Realtime's patents for "data compression products and/or services" in Texas or anywhere else. Thus, as a matter of law, CES cannot be subject to jurisdiction in Texas.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Defendants' motion and dismiss ConvergEx Group and ConvergEx Execution from this suit for lack of personal jurisdiction.

Dated:  May 12, 2010

Respectfully submitted,

By: */s/ Steven Cherny by Trey Yarbrough with permission*
Steven Cherny, *Pro hac vice*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
Tel:     212-446-4800
Fax:     212-446-4900
Email: steven.cherny@kirkland.com

Amanda Hollis, *Pro hac vice*
Carl J. Blickle, *Pro hac vice*
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60654
Tel:     312-862-2000
Fax:     312-862-2200
Email: amanda.hollis@kirkland.com
           carl.blickle@kirkland.com

Trey Yarbrough, Texas Bar No. 22133500
YARBROUGH & WILCOX PLLC
100 E. Ferguson Street, Suite 1015
Tyler, TX  75702
Tel:     903-595-3111
Fax:     903-595-0191
Email: trey@yw-lawfirm.com

*Attorneys for Defendants*
*BNY ConvergEx Group, LLC and*
*BNY ConvergEx Execution Solutions, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on May 12, 2010, the foregoing document, **DEFENDANTS BNY CONVERGEX GROUP, LLC AND BNY CONVERGEX EXECUTION SOLUTIONS LLCS' OBJECTIONS TO THE REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE DATED APRIL 28, 2010**, was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who have consented to electronic service. Local Rule CV-5(a)(3)(A).

Dated:  May 12, 2010                                      */s/ Trey Yarbrough*