**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **REALTIME DATA, LLC d/b/a/ IXO,** | § | |
| | § | |
| **Plaintiff,** | § | **Civil Action No. 6:09cv326-LED-JDL** |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **MORGAN STANLEY, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

**ORDER ADOPTING IN PART
REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

The above entitled and numbered civil action was referred to United States Magistrate Judge John D. Love pursuant to 28 U.S.C. § 636. The Magistrate Judge issued a Report and Recommendation on April 28, 2010 (Doc. No. 161) ("Report and Recommendation") recommending that Defendants BNY ConvergEx Group, LLC ("ConvergEx Group") and BNY ConvergEx Execution Solutions LLC's ("CES") (collectively, "Defendants") Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 52) be denied. ConvergEx Group and CES filed objections to the Report and Recommendation on May 12, 2010 (Doc. No. 171) ("Objections"), re-urging the Court to grant Defendants' Motion to Dismiss.  Plaintiff Realtime Data, LLC d/b/a IXO ("Realtime") filed a response to Defendants' objections (Doc. No. 189) ("Response") and ConvergEx Group and CES filed a Reply in support of their objections (Doc. No. 198) ("Reply").

Having considered the Objections to the Magistrate Judge's Opinion, the Court clarifies the reasoning of the Report and Recommendation and overrules any remaining objections. The Motion to Dismiss (Doc. No. 52) is **DENIED**.

1

Realtime accuses ConvergEx Group and CES of directly infringing its patents under 35 U.S.C. § 271. The allegations are directed to the making, using, selling, and/or offering for sale, "one or more financial data compression products and/or services for compressing and decompressing financial data." (Doc. No. 174) ("Second Am. Complaint"). Examples of infringing electronic trading and market data receipt and delivery systems, as they will be discussed herein, include:

> BNY Mellon Execution Services, Eze Order Management System ("OMS"), ConvergEx Algorithmic Suite, ConvergEx VWAP, ConvergEx TWAP, ConvergEX Initiation Price, ConvergEx Iqx Direct, ConvergEx Percentage of Volume, ConvergEx Closing Price, ConvergEx Scaling, ConvergEx Dark Probe, ConvergEx Peg, ConvergEx Portfolio Optimizer, ConvergEx Cross, VortEx, Millenium, TactEx, Sonic, DerivatEx, and Perform-Ex.[1]

SECOND AM. COMPLAINT at 17, ¶ 46. ConvergEx and CES are also accused of indirect infringement whereby the accused systems "actively induc[e] financial exchanges to compress financial data." *Id*. at ¶ 47.

The remaining background of this case was adequately set forth by the Magistrate Judge. *See* REPORT AND RECOMMENDATION at 1–2, 6–8 (characterizing the interconnected relationship between ConvergEx Group, CES, and Defendant Bank of New York Mellon Corporation). The Report and Recommendation also sets forth the parties' arguments and the law that is applicable to resolve a Motion to Dismiss under Federal Rule 12(b)(2). *See id.* at 2–6. Importantly, it should also be emphasized that when the Court decides a motion to dismiss without holding an evidentiary hearing, the plaintiff only needs to make a prima facie showing of the facts on which jurisdiction is predicated. *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). In deciding

---

[1] Although each delivery system may be referred to specifically by name, for ease of reference, these products will be generally referred to as "accused instrumentalities" or "accused systems."

whether a prima facie case exists, the court must accept as true the plaintiff's "uncontroverted allegations, and resolve in [their] favor, all conflicts between the facts contained in the parties' affidavits and other documentation." *International Printer Corp. v. Brother International Corp.*, No. 2:07-cv-361, 2008 WL 4280345, at *1 (E.D. Tex. Sept. 9, 2008); (quoting *Alpine View*, 205 F.3d at 215).

Under the present posture, neither party disputes the conclusion that there is no general jurisdiction over either Defendant in this case. Therefore, the Court adopts the Magistrate Judge's analysis and conclusions regarding general jurisdiction as the findings of the Court. *See* REPORT AND RECOMMENDATION at 8–9. Turning next to specific jurisdiction, the Court finds that the Magistrate Judge reached the correct legal conclusion that ConvergEx Group and CES are subject to jurisdiction in this forum by virtue of their Internet activities and relationships with clients in Texas. For the sake of clarity, however, the Court vacates the conclusion in the Report and Recommendation that Defendants made "offers for sale" under 35 U.S.C. § 271(a) over the Internet.

### 1.    Jurisdictional Facts Established Through the Internet

The Federal Circuit has adopted a three-prong test for determining whether the exercise of specific personal jurisdiction comports with due process. The test looks to whether (1) the defendant purposefully directed its activities at residents of the forum state; (2) the claim arises out of or relates to the defendant's activities with the forum state; and (3) assertion of personal jurisdiction is reasonable and fair. *Elec. For Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1350 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1111 (2004); *3D Sys., Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1378 (Fed. Cir. 1998).

In this case, Defendants' objections to the Magistrate Judge's recommendation that

3

ConvergEx Group and CES have sufficient contacts with the forum  are based, in large part,  on the findings relating to the website they jointly maintain at www.bnyconvergex.com ("the ConvergEx-CES website"). The Report and Recommendation accurately points out that while contacts from a parent corporation will not be imputed to its subsidiary, it cannot be ignored that the website is maintained jointly by "BNY ConvergEx Group of companies," which includes both ConvergEx Group and CES. REPORT AND RECOMMENDATION at 7 (citing cases requiring separate jurisdictional inquiries for a parent corporation and its subsidiaries). In objecting to the findings of the Magistrate Judge, ConvergEx Group and CES continue to argue that each Defendant carries out independent and limited activities such as "passively holding membership interests" (ConvergEx Group) and merely "assisting institutional investors" (CES), and that the information and tools provided on the website are insufficient contacts to support jurisdiction in this forum. *See* OBJECTIONS at 4, 5. Having reviewed the evidence put forward by Realtime—including a review of the website— and the findings and observations of the Magistrate Judge, the Court finds these arguments unavailing.

### *ConvergEx Group is More than a Mere Holding Company*

First, Judge Love was correct in determining that ConvergEx Group maintains "a web presence in a manner in which there is no meaningful way for a prospective client to determine that ConvergEx Group is separate and apart from the larger BNY ConvergEx Group of companies." REPORT AND RECOMMENDATION at 11. ConvergExGroup is disingenuous in describing itself as  a local, passive holding company because the representations on its website plainly state that "BNY ConvergEx Group, LLC is a leading provider of global agency brokerage and investment technology solutions to institutional clients worldwide." *Id*. at 10 (citing CONVERGEX-CES WEBSITE). A ConvergEx Group Press Release submitted by Realtime further describes ConvergEx Group, LLC's

"key business lines" as "Liquidity and Execution Management, Investment Technologies and Intermediary and Clearing Services."  Doc. No. 71-7 ("ConvergEx Group-Thomson Reuters Press Release"). The Press Release does not suggest that ConvergEx Group is "a mere holding company." Instead, it tends to show that the entity interacts with clients, likely the same clients maintained by CES, in order to "focus on a broad array of services designed to deliver a comprehensive, integrated platform of performance-driven, global multi-asset class trading capabilities." *Id*. This evidence makes a prima facie showing that ConvergEx Group is involved with providing clients throughout the world with instrumentalities accused of delivering potentially infringing market data.

Therefore, just as this Court found jurisdiction in a previous case where a self-described "holding company" attempted to artificially distance itself from clients and worldwide operations identified on its corporate website, ConvergEx Group is found to have operations beyond "passively holding membership interests." *See Int'l Printer Corp v. Brother Int'l Corp.*, No. 2:07-cv-361, 2008 WL 4280345, at *1–2 (E.D. Tex. 2008).   In sum, the ConvergEx-CES website represents that ConvergEx Group and CES are among several Bank of New York Mellon affiliates with a shared management structure that actively seek commissions based on the global agency brokerage and investment technology solutions they provide to clients, as solicited through the website.

### *The ConvergEx-CES Website Promotes Accused Instrumentalities*

Next,  Judge Love was correct in recognizing that the website is an appropriate channel for these Defendants to each establish contacts in the forum. A cursory examination of the website makes clear that Defendants use the ConvergEx-CES website to solicit clients by detailing the functionality and perceived benefits of the accused instrumentalities.  The following statements, as identified on the "Liquidity and Execution Management" and "Investment Technologies" sections of the ConvergEx-CES website, are representative of Defendants' online promotion of the accused

instrumentalities:[2]

- "Our comprehensive liquidity management tools enable anonymous access to dark pools, crossing engines, sophisticated algorithmic trading, advanced direct market access order types, performance measurement tools and robust **execution management systems** – all seamlessly delivered to our clients' workstations."

- "ConvergEx advanced technology gives you direct access to a broad array of diverse sources of liquidity." Examples of "cutting-edge liquidity management tools include**: ConvergEx Cross℠**, **VortEx®**, **Millenium℠ ATS**, **ConvergEx Algorithmic Suite**, **TactEx**, ADR Direct®, **Sonic℠**, **DerivatEx℠**, and **Perform-Ex℠**."

- "Our order management system is a real-time, multi-asset class, multi-strategy system that is supported by a service-oriented architecture (SOA). The **Eze OMS** provides you with a flexible and scalable solution for managing your investment process.  And it's available as both a desktop and a mobile solution. Through its **Eze OMS**, ConvergEx streamlines your firm's workflow by bringing together the functionality necessary to support portfolio management, compliance, trading and operations — in a single platform. Its four components deliver a complete solution that makes it possible for you to manage all aspects of your investment process through your OMS."

The ConvergEx-CES website promotes the accused systems and specifically identifies a partner using one of the accused systems in Texas. Attached as an exhibit to Realtime's initial Surreply, Realtime identifies one of Defendants' partners, Southwest Securities, located in Dallas,

---

[2] Bold-facing indicates a system that was identified in Realtime's Second Amended Complaint.

6

which utilizes the Eze OMS™ order management system.[3] RESPONSE at 5 (citing Doc. Nos. 92-8 & 92-9). To establish contact with the forum through the ConvergEx-CES website, Realtime need only make a prima facie showing that Defendants provide Texas clients with accused trading platforms or execution management systems. Realtime has identified statements on the website classifying Texas-based partner Southwest Securities as utilizing the accused Eze-OMS™ (Doc. 92-8). In resolving a motion to dismiss for lack of personal jurisdiction, the court "must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000) (quoting *Latshaw v. Johnson*, 167 F.3d 208, 211 (5th Cir. 1999)) (internal citations omitted). The allegations in the Complaint coupled with the representations made on the the ConvergEx-CES website support a showing that Defendants are providing Texas clients with systems that potentially infringe Realtime's patents in Texas.

Additionally, Defendants dispute whether the Report and Recommendation adequately identified the appropriate tool, i.e., the "Portfolio Viewer," as the basis for personal jurisdiction. Realtime contends that its infringement allegations broadly include "tools that provide both portfolio data (including realtime pricing information)" and "trading platforms" which would presumably include the Portfolio Viewer. RESPONSE at 4–5. Defendants' objections are given little weight in the overall jurisdictional analysis because Realtime has sufficiently linked its prima face showing of jurisdiction to other accused instrumentalities. In other words, regardless of whether the Portfolio

---

[3] The parties dispute whether an accused system, such as Eze OMS, relates to "front end" or "back end" compression, but this dispute implicates a question of fact that is best left for adjudication at a later date. For the purposes of this Motion, all controverted facts are resolved in favor of Realtime.

Viewer is specifically accused of infringement,[4] the ConvergEx-CES website sufficiently discusses other accused systems in a manner that links them to Realtime's claims of infringement in Texas. While the Report and Recommendation focused on the Portfolio Viewer, the Court previously considered other trading tools and did not base its findings exclusively on the Portfolio Viewer. Subsequent to the time the Report and Recommendation was issued, further clarity has been brought to the accused systems as a result of Realtime's Second Amended Complaint (Doc. No. 174), filed in May 2010. *See* SECOND AM. COMPLAINT at 17, ¶ 46. Accordingly, the instant jurisdictional inquiry is based on the range of products identified in the amended pleadings.

### 2.      The ConvergEx-CES Website's Level of Interactivity

The concept of personal jurisdiction by virtue of a party's Internet activities is in a state of development,[5] but "courts in this circuit analyze websites as a source of personal jurisdiction based on the nature and quality of commercial activity conducted by the site." *Powerhouse Prod., Inc. v. Widgery*, 564 F. Supp.2d 672, 679 (E.D. Tex. 2008) (quoting *Mink v. AAAA Development, L.L.C.*, 190 F.3d 333, 336 (5th Cir. 1999)) (internal citation omitted). The Report and Recommendation appropriately sets forth the spectrum of commercial activities that may designate a particular site as "highly interactive," "mid-level interactive," or "passive" (i.e. devoid of interactivity). *See* REPORT AND RECOMMENDATION at 11–14 (internal citations omitted); *see also Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp.2d 1119, 1124 (W.D. Pa. 1997).

---

[4] The Portfolio Viewer is not identified as an infringing product in the Second Amended Complaint, but is alleged to infringe in Realtime's July 2, 2010 infringement contentions.

[5] The Federal Circuit has not yet defined the standard for minimum contacts via a website. *See Variant, Inc. v. Flexsol Packaging Corp.*, No. 6:08-cv-478, 2009 WL 3082581, at *2 (E.D. Tex. Sept. 21, 2009) (citing *Litmer v. PDQUSA.com*, 326 F. Supp.2d 952, 956 (N.D. Ind. 2004)). Other circuits, including the Fifth Circuit, have adopted the *Zippo* test to establish specific jurisdiction via contacts made through an interactive website. *Revell v. Lidov*, 317 F.3d 467 (5th Cir. 2002).

The following clarification will re-categorize the ConvergEx-CES website as a "mid-level" interactive website with respect to both Defendants. *Zippo*, 952 F. Supp.2d at 1124 ("The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer."). Defendants' most recent arguments as to the level of interactivity persuades the Court that ConvergEx Group and CES are not making an online "offer to sell" under the Federal Circuit's interpretation of 35 U.S.C. § 271(a). In the absence of an "offer to sell," the website cannot be "highly interactive," but is more accurately a website with "some interactive elements" and that "allows for bilateral information exchange." *Variant, Inc. v. Flexsol Packaging Corp.*, No. 6:08-cv-478, 2009 WL 3082581, at *2 (E.D. Tex. Sept. 21, 2009) (Davis, J) (citing *Revell*, 317 F.3d at 470).

However, even in the absence of an "offer to sell," the representations on the ConvergEx-CES website are still "mid-level" under the *Zippo* sliding-scale test. Although there is no evidence that Defendants have contracted with any Texas resident through the website, the "BNY ConvergEx Group of companies" intentionally directs clients to systems accused of delivering infringing market data. *See Powerhouse*, 564 F. Supp.2d at 679 (internal citations omitted). Not only are ConvergEx Group and CES promoting their business over the Internet in a manner intended to generate transactions from prospective clients, but the website also maintains interactive features that weigh against Defendants' contention that the website is "passive." As recognized in the Report and Recommendation, this website allows clients who are residents of the forum to create a user name and password to obtain access to otherwise restricted interactive tools such as the Portfolio Viewer. *See* Doc. No. 71-5 (screen shots of login screen and user features available through the Portfolio Viewer). The website further allows clients to submit product questions relating to ConvergEx products and services, contact a particular ConvergEx representative, and read newsletters and other promotional materials that will familiarize a user with the trading tools and services marketed on

9

the website. Accordingly, the website is in the mid-level category set forth in *Zippo*. *See Invitrogen Corp. v. Evident Tech., Inc.*, No. 6:08-cv-163, slip op. at 6 (E.D. Tex. Oct. 29, 2008) (unpublished) (finding a mid-level interactive website where the website allowed users to submit contact information; to receive product information; submit product questions; sign up for company mailings and emails; and access technical documents by registering for a user name and password); *see also Powerhouse*, 564 F. Supp.2d at 679.

### 3.    Additional Contacts Supporting the Exercise of Specific Jurisdiction

Lastly, the Court agrees with the conclusions set forth in the Report and Recommendation as to "additional acts" that establish specific jurisdiction in Texas. The Federal Circuit has suggested that specific jurisdiction is appropriate where defendants maintain an interactive website and perform additional acts to purposefully avail themselves of the forum state. REPORT AND RECOMMENDATION (citing *Trintec Indus., Inc. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, 1281 (Fed. Cir. 2005)). These case have indicated that "something  additional beyond a website is required to establish personal jurisdiction." *GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1346 (Fed. Cir. 2000) (holding that personal jurisdiction could not be based upon "mere accessibility to an Internet site in the forum where defendants had no additional contacts). Here, the interactive website in combination with Defendants' other promotional activities in the forum, demonstrates purposeful availment of the forum.

#### *ConvergEx Group*

The Report and Recommendation identified a "targeted alliance" between ConvergEx Group and Thomson Reuters that provides ConvergEx Group access to Thomson Reuters' Texas client base. REPORT AND RECOMMENDATION at 16–17; *see also* CONVERGEX GROUP–THOMSON REUTERS PRESS RELEASE (Doc. No. 71-7) ("As part of this agreement, Thomson Reuters will become a

10

preferred market data provider for ConvergEx clients, and ConvergEx will become a preferred broker for Thomson Reuters clients."). ConvergEx Group objects to the Report and Recommendation and argues that its customer-referral agreement with Thomson Reuters is not a sufficient additional contact with the forum to support personal jurisdiction because there is not a connection between the brokerage agreement and Realtime's infringement claims. OBJECTIONS at 10–12. These objections are not persuasive, however, because the preferred brokerage agreement is a purposeful activity that provides ConvergEx Group with targeted access to residents of the forum.

The agreement directly relates to Realtime's infringement claims because once a Texas customer is referred through the agreement, ConvergEx Group is positioned to provide the accused systems identified in the Second Amended Complaint. In a Press Release, a Thomson Reuters executive describes ConvergEx Group's role in the strategic alliance: "ConvergEx, with its leading trading technology solutions, substantially *extends our ability to further deliver value to clients through content, analytics and market liquidity solutions*." CONVERGEX GROUP–THOMSON REUTERS PRESS RELEASE (emphasis added). The Report and Recommendation correctly found this alliance to qualify as purposeful availment of the forum state. This finding is not a significant departure from the targeted advertising deemed sufficient in *Autobytel*. *See Autobytel*, 2009 WL 901482, at *3. Both a targeted alliance with a partner already doing business in Texas and online advertising indicate an intention to have a presence in the forum. ConvergEx was purposeful in its efforts to develop further business and revenue in Texas, and given the possibility that such efforts facilitate infringement, it should be prepared to defend itself in this district.

Additionally, the Court finds no merit in ConvergEx Group's contention that this Court should engage in a specific jurisdiction analysis that does not consider specific acts of purposeful

availment such as "advertising, conducting business transactions with residents of the forum state, and soliciting funds from residents of the forum state" as they were considered in *Autobyetel.* 2009 WL 901482, at *2. In Texas, personal jurisdiction over an out-of-state defendant if the Texas long-arm statute permits jurisdiction without violating federal due process as set forth in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). The Texas long-arm statute confers jurisdiction to the limits of due process. *Stroman Realty, Inc. v. Antt*, 528 F.3d 382, 385 (5th Cir. 2008); *see* TEX. CIV. PRAC. AND REM. CODE ANN. § 17.041–.045; *see also Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003). Even a single contact[6] can support specific jurisdiction if the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Construcciones Integrales del Carmen, SA.A de C.V. v. Goodcrane Corp.*, No. H-08-3427, 2009 WL 188925, at *3 (S.D. Tex. June 20, 2009); *Gundle Lining Const. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996).  The Court finds ConvergEx Group's preferred brokerage agreement to be directly related to Realtime's infringement allegations and a sufficient contact for ConvergEx Group to reasonably anticipate being haled into court in the forum state.

### CES

As identified in the Report and Recommendation, CES's contacts with the forum state are firmly established and its client relationships in Texas are directly related to Realtime's claims of patent infringement. REPORT AND RECOMMENDATION at 17–19. In particular, CES maintains additional contacts in Texas such as relationships with some 40 Texas clients (4% of its financial services clients) and derives as much as 2.2% of its revenue based on services provided to Texas

---

[6] For example, in *Autobytel, Inc. v. Insweb Corp.*, the Court found personal jurisdiction where plaintiff could only point to a single sale of a software license to a Texas resident, *Autobytel, Inc. v. Insweb Corp.*, No. 2:07-cv-524, 2009 WL 901482, at *2–3 (E.D. Tex. Mar. 31, 2009), and similarly, this court has found personal jurisdiction where defendant allegedly provided infringing services to only two defendants. *AdvanceMe, Inc. v. Rapidpay LLC*, No. 6:05-cv-424, 450 F. Supp.2d  669, 673 (E.D. Tex. 2006).

clients. *Id*. It is also undisputed that CES has a Texas client who has used the CES Execution Management System in the past.[7] Resolving all factual conflicts in favor of the Plaintiff, the Court finds that CES has the requisite contacts to warrant specific jurisdiction in this forum.

**4.    The Assertion of Personal Jurisdiction is Reasonable and Fair**

The Court adopts the findings of the Report and Recommendation regarding whether the exercise of jurisdiction is fair and reasonable. "Texas has a strong interest in discouraging injuries, including patent infringement, occurring within its borders." *Variant*, 2009 WL 3082581, at *3. The accused systems have been used by Texas residents and Realtime has a strong interest in obtaining relief for claims that ConvergEx Group and CES infringe its patents.

**CONCLUSION**

As to the remainder of Defendants' objections, the Court has reviewed the findings and conclusions of the Magistrate Judge *de novo* and finds them to be correct. FED. R. CIV. PRO. 72(b). For the foregoing reasons, the Court hereby **ADOPTS in part** the Report and Recommendation of the Magistrate Judge.  The Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 52) is **DENIED**.  The Court further **OVERRULES** all objections beyond those which are clarified herein.

**So ORDERED and SIGNED this 26th day of August, 2010.**



**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**

---

[7] CES states that it has a Texas client who uses the EMS System but represents that it has not used the system in 2009. Doc. No. 52 at 4.